# ERIE RAILROAD COMPANY *v.* SHUART ET AL., DOING BUSINESS UNDER THE NAME OF JOHN R. SHUART & SONS.

## CERTIORARI TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 342. Submitted April 25, 1919.—Decided June 9, 1919.

In a contract governing an interstate shipment of live stock the carrier's liability for negligent injury of the stock during transportation may lawfully be conditioned upon the presentation of a written claim by the shipper within five days from their removal from the cars. P. 467.

In view of the enlarged scope of "transportation," as defined by the Hepburn Act, an interstate movement of live stock is not ended when the car containing them is placed opposite a cattle chute of the carrier on a switch track at destination and left in charge of the shipper for unloading, when an adequate time for unloading them has not expired, although the shipper assumed the duty, risk and expense of their unloading by the terms of the contract for transportation. *Id. Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Dettlebach*, 239 U. S. 588.

Reversed.

THE case is stated in the opinion.

*Mr. Thomas Watts* for petitioner.

*Mr. Reeves T. Strickland* for respondents. *Mr. Frank Comesky* was on the brief.

Mr. Justice McReynolds delivered the opinion of the court.

Respondents delivered to the Toledo, St. Louis & Western Railroad at East St. Louis, Illinois, a carload of horses for transportation, under a Limited Liability Livestock Contract or bill of lading via petitioner's road, to themselves at Suffern, New York, their home. Among other things the contract provided:

"That the said shipper is at his own sole risk and expense to load and take care of, and to feed and water said stock whilst being transported, whether delayed in transit or otherwise, and to unload the same; and neither said carrier nor any connecting carrier is to be under any liability or duty with reference thereto, except in the actual transportation of the same." . . . "That no claim for damages which may accrue to the said shipper under this contract shall be allowed or paid by the said carrier, or sued for in any Court by the said shipper, unless a claim for such loss or damage shall be made in writing, verified by the affidavit of the said shipper or his agent, and delivered to the General Auditor of the said carrier at his office in the City of Chicago, Ill., within five days from the time said stock is removed from said car or cars, and that if any loss or damage occurs upon the line of a connecting carrier, then such carrier shall not be liable unless a claim shall be made in like manner, and delivered in like time, to some proper officer or agent of the carrier, on whose line the loss or injury occurs."

Immediately after the car arrived at Suffern, petitioner placed it on a switch track opposite a cattle chute and left it in charge of respondents for unloading. By letting

down a bridge they at once connected the chute and car and were about to lead out four horses when an engine pushed other cars against it and injured the animals therein. No written claim was made for the loss or damage as provided by the bill of lading; and when sued the carrier defended upon that ground. Respondents maintain that transportation had ended when the accident occurred and consequently no written claim was necessary. The courts below accepted this view.

Under our former opinions, the clause requiring presentation of a written claim is clearly valid and controlling as to any liability arising from beginning to end of the transportation contracted for. *Chesapeake & Ohio Ry. Co.* v. *McLaughlin,* 242 U. S. 142; *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Starbird,* 243 U. S. 592; *Baltimore & Ohio R. R. Co.* v. *Leach,* 249 U. S. 217; *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Dettlebach,* 239 U. S. 588, 593, 594; and *Southern Ry. Co.* v. *Prescott,* 240 U. S. 632.

In *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Dettlebach* we pointed out that the Hepburn Act enlarged the definition of "transportation" so as to include "cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration, or icing, storage, and hauling of property transported"; and we said from this and other provisions of the act "it is evident that Congress recognized that the duty of carriers to the public included the performance of a variety of services that, according to the theory of the common law, were separable from the carrier's service as carrier, and, in order to prevent overcharges and discriminations from being made under the pretext of performing such additional services, it enacted that so far as inter-

state carriers by rail were concerned the entire body of such services should be included together under the single term 'transportation' and subjected to the provisions of the Act respecting reasonable rates and the like."

In the instant case, when injured, the animals were awaiting removal from the car through a cattle chute alleged to be owned, operated and controlled by the railroad. If its employees had then been doing the work of unloading there could be no doubt that transportation was still in progress; and we think that giving active charge of the removal to respondents, as agreed, was not enough to end the interstate movement. The animals were in the car; no adequate time for unloading had transpired. The carrier had not fully performed the services incident to final delivery imposed by law. These included the furnishing of fair opportunity and proper facilities for safe unloading although the shippers had contracted to do the work of actual removal. See Hutchinson on Carriers, §§ 711, 714, 715.

Petitioner's request for an instructed verdict in its behalf should have been granted. The judgment below must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE CLARKE dissenting.

I greatly regret that I cannot concur in the opinion and judgment of the court in this case, but I cannot consent to share in what seems to me a very strained construction of a definition in the Hepburn Act (34 Stat. 584, c. 3591, § 1) which will result in keeping alive a bill of lading, with the effect of excusing the carrier from liability for negligently damaging the live stock of a consignee, after it had been delivered, on the ground that a claim in writing for the damage, duly verified, had not been presented within five days.

My reasons for dissenting, stated as briefly as may be, are as follows:

It is shown by the opinion of the court that the consignee, a partnership of three members, was bound by the bill of lading to unload the horses at destination.

The consignee, being notified by the carrier as to the probable time of the arrival of the car, on the day before it arrived, paid what was supposed to be the full amount of the freight charges, and two members of the partnership were at the station at three o'clock in the morning to receive and unload it.

When the train came, the senior member of the consignee stood in the cattle chute with the conductor, while the latter was placing the car for unloading and approved as satisfactory the position in which it was placed. Thereupon, a brakeman set the brake, the engine was cut off and the conductor went away and left the car in the sole custody of the consignee, after saying to its representative, "You had better get them out as soon as you can, they have been on the road a good while and must be tired and hungry." Two members of the partnership, consignee, went to work at once to unload the horses, but it was necessary to get some boards to make the bridge from the car to the chute safe, and in about half an hour, when the two were in the act of leading two horses from the car, other cars were negligently thrown against it and caused the damage sued for.

I dissent from the opinion of the court because I agree with the three New York courts that the undisputed facts thus stated show that the transportation was ended and the delivery of the stock was so completely made as to end all liability of the carrier under the bill of lading, before the negligence of the company occurred which caused the damage complained of.

What constitutes delivery of goods or of live stock by a carrier is usually a mixed question of law and fact, but

where, as here, the facts are not disputed, it is a question of law.

What more was there for the carrier to do,—what more could it have done—to make more complete the delivery necessary to fulfill its obligation as a carrier? The journey was ended, the freight charges were paid, and the car was placed on a side track in an appropriate place and position for unloading, which was approved by the consignee. It had been accepted by two members of the partnership, consignee, and had passed into their exclusive custody a full half hour before the accident. No assistance was asked for or needed after the conductor delivered the car and went away and thereafter the carrier owed to the consignee only the duty which it owed to any property lawfully upon or near to its tracks,—not to negligently or wilfully injure it, and it was for violation of that duty, not for failure to discharge duties imposed by the bill of lading, that this suit was instituted. The case is one of side track delivery, the equivalent of the familiar delivery of a car to an "industrial track" or "team unloading track" of a railroad, with possession taken by the consignee before the damage was done.

To the weighty authority of the New York courts which decided in this case that the delivery was complete before the damage was done, may be added, a few from many, the decisions of the Supreme Courts: of Michigan, in a strikingly similar case but with not so complete a delivery, in *Brown* v. *Pontiac, Oxford & Northern R. R. Co.*, 133 Michigan, 371; of Illinois, in *Gratiot Street Warehouse Co.* v. *St. Louis, Alton & Terre Haute R. R. Co.*, 221 Illinois, 418; of North Carolina, in *Reid* v. *Southern Ry. Co.*, 149 N. Car. 423; of Georgia, in *Kenny Co.* v. *Atlanta & West Point R. R. Co.*, 122 Georgia, 365. And see *Hedges* v. *Hudson River R. R. Co.*, 49 N. Y. 223.

The definition of "transportation" in the Hepburn Act (34 Stat. 584), relied upon in the court's opinion, seems

to me quite irrelevant.  That provision was incorporated into the act to prevent unjust discrimination by carriers in terminal delivery charges, as the context and the history of the act abundantly show.  It defined "transportation" but did not define what should constitute delivery to a consignee,—that was left untouched and is governed by the prior decisions of courts and by those which have been developed since.

Equally beside the question involved seems to me the decision in *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.* v. *Dettlebach*, 239 U. S. 588, 593, 594, cited in the opinion of the court.  The question there under consideration was, whether when goods carried to destination were lost, after they had been held more than a month uncalled for, the liability of the carrier was to be determined by the terms of the bill of lading or by the more limited liability of a warehouseman.  Obviously there was no question in the case as to what constituted delivery, for there was no pretense of delivery, actual or constructive, and therefore the decision cannot be of service in determining this case.

The opinion of the court in this case concludes:

"The animals were in the car; no adequate time for unloading had transpired.  The carrier had not fully performed the services incident to final delivery imposed by law.  These included the furnishing of fair opportunity and proper facilities for safe unloading although the shippers had contracted to do the work of actual removal.  See Hutchinson on Carriers, §§ 711, 714, 715."

I cannot find justification, in the sections cited, for such a statement of the law as is here made.

Section 711 deals with the obligation to unload carload freight, and, after saying that it is "the uniform rule and custom in this country" for the consignee to unload, the only other relevant statement of the writer is:

"All, therefore, that can be required of the railroad

company is that it shall place the cars where they may be safely and conveniently unloaded."

This the carrier in the case before us had done to the satisfaction and acceptance of the consignee before the accident complained of.

Section 714 deals with the liability of the carrier pending removal (delivery) of the goods, and says:

"During this reasonable time [for delivery] the liability of the carrier remains unchanged; but so soon as it has elapsed he no longer stands in the relation of carrier to the goods, but in that of an ordinary bailee for hire."

The "reasonable time" here referred to is palpably that necessary for the carrier to wait before its obligation becomes that of a warehouseman when the consignee does not appear to claim the shipment,—it is not applicable to the time for unloading after the property has been accepted by the consignee.

Section 715 declares that:

"If the consignee is bound to unload the goods himself from the car, it is the duty of the carrier to place the car where it can be unloaded with a reasonable degree of convenience, and to furnish the consignee with safe and proper facilities for the purpose."

All of this the carrier in this case did, and the consignee not only approved as satisfactory, safe and proper, the position in which the car was placed and the facilities furnished for unloading it, but the delivery of the car was accepted and was in the actual possession and custody of the consignee for a very considerable time before the accident complained of happened. It was not in any attempt or effort on the part of the carrier to improve the unloading facilities or to assist the consignee that the damage was done, but it was the result of a tort, pure and simple,—of a negligent switching operation, entirely independent of the delivery of the shipment, occurring a half hour after it had been accepted.

The delivery having been completed and accepted by the consignee, the five-day limitation, so unreasonable in itself that it has been prohibited by congressional enactment (38 Stat. 1196, c. 176, § 1) has, in my judgment, no applicability to this case, and to bottom the conclusion announced upon the definition of "transportation" in the Hepburn Act is to convert what was intended for the protection of shippers of property in interstate commerce into an instrument of injury and injustice.

For the reasons thus stated I dissent from the opinion and judgment of the court.

MR. JUSTICE McKENNA and MR. JUSTICE BRANDEIS concur in this dissent. MR. JUSTICE DAY also dissents.